1

2

3

4

5

6

7

8                            IN THE UNITED STATES DISTRICT COURT

9                           FOR THE EASTERN DISTRICT OF CALIFORNIA

10    JOHN FRANCIS HILDEBRAND,

11              Petitioner,                    No. CIV S-04-0607 FCD GGH P

12        vs.

13    VERNE SPEIRS, et al.,

14              Respondent.           <u>FINDINGS AND RECOMMENDATIONS</u>

15    _____/

16    I. <u>Introduction</u>

17              Petitioner is proceeding through counsel with a petition for writ of habeas corpus

18    pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction[1] for the following

19    misdemeanors:  one count of sexual battery (Cal. Penal Code § 243.4(d)), two counts of battery

20    (Cal. Penal Code § 242)) and one count of sexual battery by a physician (Cal. Penal Code §

21    729)).  Petitioner was sentenced to three years of probation which included the following terms:

22    ninety days of community service, sixty days in county jail, counseling, and compliance with the

23    orders of the Board of Medical Quality Assurance.

24    _____

25              [1] For purposes of "custody," petitioner just barely satisfies federal requirements.  He was
      sentenced to three years probation with conditions on March 29, 2001.  The federal petition was
26    not commenced until March 26, 2004.

                                              1

1    This action is proceeding on the original petition filed March 26, 2004.

2    Petitioner alleges that he was denied the effective assistance of counsel (3 claims) and that the

3    trial court improperly admitted evidence of uncharged conduct.

4    Also pending before the court is respondent's motion to dismiss filed April 28,

5    2004.  After carefully reviewing the record, the court recommends that respondent's motion be

6    denied and that the petition be denied.

7    II.  Motion to Dismiss

8    Respondent argues that petitioner's claim challenging admission of uncharged

9    conduct is not exhausted because it was not presented to the California Supreme Court.

10   Petitioner raised this claim in his direct appeal to the Sacramento Superior Court appellate

11   department.[2]  The Sacramento County Superior Court denied the appeal on June 27, 2002.

12   Answer, Exhibit B.  Petitioner claims, and respondent does not dispute, that he filed a timely

13   petition for hearing and application for certification to the California Court of Appeal, which was

14   denied by the appellate department on July 26, 2002.

15   Former Rule 62 of the California Rules of Court provided that the California

16   Court of Appeal could transfer an appellate department proceeding to itself on its own motion,

17   but there was no provision for such an application by a misdemeanant directly to the California

18   Court of Appeal.  Therefore, after the Superior Court denied petitioner's appeal, there was no

19   mechanism for him to apply for relief to either the California Court of Appeal or the California

20   Supreme Court.  See Whittaker v. Superior Court, 68 Cal. 2d 357, 365, 66 Cal. Rptr. 710, 717

21   (1968).

22   Had petitioner raised his claim challenging the admission of uncharged conduct in

23   a habeas corpus petition filed in the California Supreme Court, it would have been denied

24   

25   [2]A California defendant has a right to appeal a misdemeanor conviction only to the
     appellate department of the Superior Court.  See Cal. Penal Code § 1466; Cal. Rule of Court
26   180(b), 182.  See also Witkin, *Cal. Criminal Law*, 3rd ed. (2000), Criminal Appeal, § 1.

1    pursuant to In re Waltreus, 62 Cal. 2d 218, 42 Cal. Rptr. 9 (1965) (claims already raised on

2    appeal in state court cannot be presented again in state habeas).  Requiring petitioner to exhaust

3    this claim in a habeas corpus petition under these circumstances would be perverse.

4         Because petitioner could not have sought further review of this claim, the court

5    recommends that respondent's motion to dismiss be denied.  Swoopes v. Sublett, 196 F.3d 1008

6    (9th Cir. 1999) (pursuant to O'Sullivan v. Boerckel, 526 U.S. 838, 119 S. Ct. 1728 (1999)

7    exhaustion to the highest state court is not required when a state declares certain remedies are not

8    available at the state supreme court level).[3]

9    III.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

10        The AEDPA applies to this petition for habeas corpus which was filed after the

11   AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy,

12   117 S. Ct. 2059 (1997).   The AEDPA "worked substantial changes to the law of habeas corpus,"

13   establishing more deferential standards of review to be used by a federal habeas court in

14   assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

15   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

16        In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

17   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

18   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

19   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

20   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

21   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

22   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

23   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

24   \\\\\

25

26        [3]  The failure of respondent's counsel to appear at the June 3, 2004, hearing regarding this
     motion arguably waives respondent's right to object to this finding.

1      "Unreasonable application" of established law, on the other hand, applies to

2    mixed questions of law and fact, that is, the application of law to fact where there are no factually

3    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

4    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

5    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

6    deference is not blindly automatic, "the most important point is that an *unreasonable* application

7    of federal law is different from an incorrect application of law....[A] federal habeas court may not

8    issue the writ simply because that court concludes in its independent judgment that the relevant

9    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

10   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

11   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

12   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

13   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

14        The state courts need not have cited to federal authority, or even have indicated

15   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

16   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

17   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

18   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

19   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

20   established Supreme Court authority reviewed must be a pronouncement on constitutional

21   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

22   binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

23        However, where the state courts have not addressed the constitutional issue in

24   dispute in any reasoned opinion, the federal court will independently review the record in

25   adjudication of that issue.  "Independent review of the record is not de novo review of the

26   constitutional issue, but rather, the only method by which we can determine whether a silent state

4

1  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

2  2003).

3  IV. Background

4  The first amended complaint contained ten charges against petitioner, a medical

5  doctor, based on misconduct. Respondent's Answer, Exhibit A. Six of the counts alleged

6  Kathleen Lederman, a former patient, as the victim. Id. The remaining four alleged Mary

7  Rodriguez, a former employee, as the victim. Id. Petitioner was found guilty of four of the

8  counts alleging Lederman as the victim, counts 1-4. RT at 1448-1451. Petitioner was acquitted

9  of four of the counts alleging Rodriguez as the victim, counts 7-10. Id. It is unclear to the court

10  why no verdict was rendered as to the other two counts, but that is not material to the court's

11  consideration of the petition.

12  At trial, Lederman and Rodriguez testified regarding petitioner's conduct. In

13  addition, three other women testified regarding misconduct by petitioner toward them (Candice

14  Walker, Shannon Green and Yolanda Villanueva). These women came forward to law

15  enforcement after hearing about the case against petitioner in the media. The court will not

16  discuss Rodriguez's testimony because petitioner was acquitted of the charges against her. The

17  court will discuss the testimony of Walker, Green and Villanueva in the section below addressing

18  petitioner's claim challenging admission of the uncharged conduct.

19  Kathleen Lederman was one of petitioner's patients. RT at 650-651. In July 2000

20  an incident occurred in petitioner's office. RT at 651. She went to see petitioner because she

21  thought she had the flu. RT at 651. When petitioner walked into the examination room, he told

22  Lederman that she looked like shit. RT at 655. He told her to sit up and then gave her a hug. RT

23  at 655. He had given her a hug one other time during the previous ten years he had been her

24  physician. RT at 656.

25  After the hug, petitioner listened to her back with a stethoscope. RT at 657. He

26  then lifted the front of her shirt and listened to her breathing with the stethoscope. RT at 657.

After he moved the stethoscope around a couple of times, he stuck his hand underneath Lederman's bra and touched her breast. RT at 657. Lederman became nervous and told petitioner that she felt hot. RT at 659. Petitioner stepped back and said, "You feel hot. You always feel hot to me." RT at 660. He may have said, "You look hot to me." RT at 660. Petitioner then grabbed her and hugged her again. RT at 661. He then began grinding her leg with his erect penis. RT at 662-663. He then took her right hand and started rubbing it on his crotch. RT at 663. Lederman then told petitioner that he was her doctor, he was married, he can't do this. RT at 665. Petitioner then turned and put his mouth on her neck. RT at 665. After thirty seconds or so, she began pulling away. RT at 666. Petitioner then said to her that he felt that she needed some really good sex. RT at 666. At this point, Lederman hopped off the table and left the room. RT at 666-667.

Lederman later contacted the Sheriff's Department. RT at 670. A deputy sheriff asked her to call petitioner and talk to him about what happened. RT at 670. Lederman made this phone call, which was recorded and played to the jury. RT at 670-671. The tape recording was not transcribed in the reporter's transcript. However, the opinion of the Sacramento County Superior Court denying petitioner's habeas corpus petition contains a transcription of the conversation. Petitioner does not dispute the Superior Court's transcription so the court adopts it here:

Kathleen: I, I kind of wanted to talk to you about like what happened.

Petitioner: Uh-huh.

Kathleen: Last week.

Petitioner: Yeah.

Kathleen: What was that about?

Petitioner: I don't know.

Kathleen: I'm like em–this is like a little embarrassing.

Petitioner: I'm sorry.

Kathleen: You've been my doctor for like ten years.

Petitioner: Yeah, yeah.  Well, I don't know.  I thought you put your arms around me so I put my arms around you.

Kathleen: I don't know.  Um, I don't know.  I just–I'm just trying to understand like–I don't know.  Like why you grabbed my hand and placed it in your pants and stuff.

Petitioner: Oh, come on.  Well, um,–well, again, I misinterpreted your–your behavior, so–

Kathleen: I mean, like do you like–is it cuz like you find me attractive or—

Petitioner: Uh, (laughs) yeah.  I mean, If I didn't find you attractive I would have been pushing you away, right?

Kathleen: Well, I don't know.  I'm not sure.  I was just–I mean, I was just shocked.  You know, I mean, I just was sick and like tired and whatever.  And the next thing I know it was like I'm sitting there and like you're grinding up against my leg and my hand–you know, you put my hand down in your thing.  And I was just like, okay.  And it's like when I left the office I'm just like, "Oh, my God, what was this about?"  So I don't know.  I just felt weird like I was just like–I wanted to talk to you about it cuz I was like, "Okay, like I feel like weird going back to him without like talking about this."

Petitioner: Yeah, I know.  I appreciate that.  Well, again, I apologize.  I misinterpreted your–your behavior, I guess...

".....

Kathleen: But then, I don't know, it was like I gave you a hug, but then the next thing I know it was like, okay, you're like kissing my neck and rubbing against me and my hand's getting pushed down on your thing.  And I was like, "Okay.  Where is this coming from?"  Like, "He's never come onto me before."

Petitioner: Uh-huh.

Kathleen: I don't know.  I mean, I just–I don't know.  Like I just kind of think it was inappropriate in a way.

Petitioner: Yeah, I know.  I agree.  I agree.

".....

Petitioner: ....I develop, I think, a certain amount of affection for people, you know, I've seen for a long time and stuff.  And, um, I admit I was probably–was unprofessional.

Respondent's Answer, Exhibit D, pp. 11-14.

1  V.  Discussion

2           A.  Ineffective Assistance of Counsel: Claims 1, 2, 3

3           Petitioner raised his ineffective assistance of counsel claims in his state habeas

4  petitions.  These claims center about petitioner's allegations that trial counsel had specific reason

5  to seek available impeachment evidence against one of the complainants (Kathleen).  The

6  Sacramento County Superior Court issued a reasoned opinion denying these claims.  Answer,

7  Exhibit D.  The California Court of Appeal and California Supreme Court denied petitioner's

8  habeas petitions without comment or citation.  Answer, Exhibits F, G.  Accordingly, the court

9  "looks through" the summary dispositions to the last reasoned decision, i.e. the opinion of the

10 Superior Court, in determining whether the state courts reasonably applied clearly established

11 Supreme Court authority.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000)

12 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991)).

13          *Legal Standard*

14              1. Ineffective Assistance

15          The test for demonstrating ineffective assistance of counsel is set forth in

16 Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

17 that, considering all the circumstances, counsel's performance fell below an objective standard of

18 reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

19 identify the acts or omissions that are alleged not to have been the result of reasonable

20 professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

21 whether in light of all the circumstances, the identified acts or omissions were outside the wide

22 range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

23 counsel's conduct was within the wide range of reasonable assistance, and that he exercised

24 acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

25 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

26 \\\\\

8

1   Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

2   693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

3   counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

4   694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

5   confidence in the outcome."  Id., 104 S. Ct. at 2068.

6   In extraordinary cases, ineffective assistance of counsel claims are evaluated

7   based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

8   1495, 1512-13 (2000) (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

9   The Supreme Court has recently emphasized the importance of giving deference

10   to trial counsel's decisions, especially in the AEDPA context:

11   In Strickland we said that "[j]udicial scrutiny of a counsel's
    performance must be highly deferential" and that "every effort
12   [must] be made to eliminate the distorting effects of hindsight, to
    reconstruct the circumstances of counsel's challenged conduct, and
13   to evaluate the conduct from counsel's perspective at the time."
    466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is
14   presented with an ineffective-assistance claim not subject to §
    2254(d)(1) deference, a [petitioner] must overcome the
15   "presumption that, under the circumstances, the challenged action
    'might be considered sound trial strategy.'"  Ibid. (quoting Michel
16   v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

17   For [petitioner] to succeed, however, he must do more than show
    that he would have satisfied Strickland's test if his claim were
18   being analyzed in the first instance, because under § 2254(d)(1), it
    is not enough to convince a federal habeas court that, in its
19   independent judgment, the state-court decision applied Strickland
    incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he
20   must show that the [ ]Court of Appeals applied Strickland to the
    facts of his case in an objectively unreasonable manner.

21

22   Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

23   Counsel can be ineffective for performing, or not performing, an act permitted or

24   precluded by state law.  In cases of ineffective assistance of counsel involving not acquiring and

25   presenting evidence, petitioner will have to show that his counsel acted unreasonably in not

26   acquiring the evidence, that the evidence was probably admissible, *and* that the evidence would

9

have caused this federal court to lose confidence in the outcome of the underlying case.  The first

criteria is generally directed to the reasonableness of counsel's actions, the second straddles

reasonableness and prejudice, while the last criteria is a pure prejudice inquiry.

2.  Evidentiary Hearing

Generally:

> To obtain an evidentiary hearing on an ineffective assistance of counsel claim, a habeas petitioner must establish that (1) his allegations, if proven, would constitute a colorable claim, thereby entitling him to relief and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.

Correll v Stewart, 137 F.3d 1404, 1413 (9th Cir. 1998).  If, of course, petitioner's facts cannot

stand as the basis for a federal claim, e.g., the alleged error is not prejudicial as a matter of  law,

no evidentiary hearing is required.

Since the passage of AEDPA, a petitioner who has "failed to develop" a claim,

i.e., had an opportunity to develop a claim, but did not do so, is not entitled to an evidentiary

hearing unless that petitioner demonstrates diligence to discover the factual predicate for his

claim despite his "failure," and that he is actually innocent of the crime for which he was

convicted.  28 U.S.C. § 2254(e)(2); Williams (Michael) v. Taylor, 529 U.S. 420, 120 S. Ct. 1479

(2000).  A petitioner has not neglected his or her rights in state court if diligent in efforts to

search for evidence.  Williams, 529 U.S. at 435-437, 120 S. Ct. at 1490.  "Diligence ... depends

upon whether the prisoner made a reasonable attempt, in light of the information available at the

time, to investigate and pursue claims in state court."  Id.  "Diligence require[s] in the usual case

that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner

prescribed by state law."  Id.; see also Bragg v. Galaza, 242 F.3d 1082, 1090 (9th Cir. 2001), as

amended 252 F.3d 1150 (9th Cir. 2001).

A petitioner must do more than simply allege a general conclusion, e.g., counsel

could have acquired evidence that would have made a difference, see Williams v. Woodford ,

384 F.3d 567, 588 (9th Cir. 2004); on the other hand, petitioner need not prove his case with

1    submission of all evidence before a hearing is permitted.

2            *Failure to Investigate Lederman's Record of Making False Statements/Charges*

3            Petitioner contends that on September 15, 2000, his counsel obtained the services

4    of an investigator who prepared a report indicating Lederman's involvement in four lawsuits plus

5    her bankruptcy petition.  On September 28, 2000, defense counsel asked the investigator to

6    obtain the file relating to Lederman's 1990 divorce and review it for information regarding her

7    former husband's allegations about her conduct with other men while married.  Counsel also

8    instructed the investigator to investigate an organization mentioned in Lederman's medical

9    records obtained in connection with a personal injury claim against Thrifty/Rite Aid.  Petitioner

10   contends that on October 18, 2000, the investigator provided defense counsel with a copy of

11   Lederman's bankruptcy file, but none of the other court files.

12           Petitioner argues that the records from these other lawsuits demonstrated that

13   Lederman had a pattern and practice of making false statements in court proceedings under oath

14   for her benefit and would have provided the defense with enormous impeaching evidence that

15   was otherwise lacking.  In particular, petitioner claims that in 1996 Lederman filed a lawsuit

16   against Dr. Bernstein alleging negligence when he performed cosmetic surgery on her.  Petitioner

17   contends that the complaint was false because no one was aware of any untoward effect of the

18   surgery.  Petitioner admits that Lederman voluntarily dismissed this lawsuit three months after it

19   was filed and the complaint was never served.

20           Petitioner also contends that Lederman filed a lawsuit against Thrifty/Rite Aid

21   after she fell in the store.  Petitioner contends that Lederman made false statements during her

22   deposition in this case.  In particular, petitioner claims that Lederman falsely testified that she

23   had lived with no one other than her daughter since 1997.  In fact, petitioner claims, Joe

24   Liashenko lived in Lederman's residence from August 1995 through February 1999.  Petitioner

25   cites the following deposition testimony in support of this claim:

26   \\\\\

Q: Okay. Any other members of your household since about 1997?
A: What do you mean by that?
Q: I mean people that live with you.
Lederman's counsel (Mr. Kreeger): No.
A: No.
Q: Excuse me, counsel, is there some reason that you feel the need to answer the question rather than your client?
Lederman's counsel: Objection, it's not relevant. How is that? Not likely to lead to the discovery of admissible evidence.
Q: Yes, it is. But your client has already answered the question.

Petitioner also claims that Lederman lied during this deposition when she denied that her boyfriend, Robert Neuman, had moved into her home in the summer of 1996 and lived there continuously through the time of the deposition. Petitioner claims that, in fact, Neuman lived in her home during this time. Petitioner also claims that Lederman did not disclose her lawsuit about Dr. Bernstein when asked about other lawsuits she had filed.

Petitioner claims that Lederman lied during the 1999 criminal trial against Mr. Liashenko, who was accused of molesting her daughter. At this trial, Lederman testified to living with Neuman and Liashenko, which she had denied in her Thrifty/Rite Aid lawsuit. She also falsely denied a prior sexual relationship with Liashenko.

Petitioner also claims that Lederman made false statements in a 1999 bankruptcy petition. In particular, she under-valued her property, falsely claimed a $75,000 residential exemption under Cal. Code Civil Pro. § 704,730(a)(2), made a false claim of an auto lien held by her boyfriend, failed to declare Liashenko's rent as part of her income, understated the proceeds from her Thrifty/Rite Aid lawsuit, and failed to list the auto lien transaction on the Statement of Financial Affairs.

In reviewing these claims, the Sacramento County Superior Court found that several of the statements either were not false or else that petitioner had not presented sufficient evidence of their falsity. Assuming the falsity of all the statement described above, the Superior Court found that the tape-recorded conversation between petitioner and Lederman "sealed his fate."

As to Lederman's lawsuit against Dr. Bernstein, the Superior Court found that the malpractice lawsuit which was never served and was dismissed with prejudice a few months later had little or no impeachment value.  Respondent's Answer, Exhibit E, p. 9.

> It is mere speculation on petitioner's part as to why Kathleen L. requested the dismissal of the lawsuit, and whether she had actually incurred scarring and disfigurement from her surgery would have been a collateral issue that probably would have been subject to Evid. Code § 352 exclusion.  Nor does a declaration from Liashenko, whom Kathleen L. had accused of molesting her daughter, carry any significant credibility, nor does his failure to observe any scarring on Kathleen L.'s face or scalp mean that it was not there.  The matter had little or no impeachment value.

Id., p. 9.

The Superior Court found that Lederman's testimony during the Thrifty/Rite Aid lawsuit deposition did not have impeachment value.  Her answering "no" to a question about who else lived with her at the same time her attorney answered no and objected to the line of questioning, did not have much probative value because the contemporaneous objection by her attorney called into question whether her "no" was a response to the objection rather than a substantive answer the question.  Id.

With regard to petitioner's claim that Lederman lied when she denied having had a sexual relationship with Liashenko, the Superior Court stated that he failed to attach any documentary or other evidence to support such a claim.  Id., p. 3.  The Superior Court observed that the Liashenko affidavit submitted in support of the petition did not mention any sexual relationship with Liashenko.  Id.

The Superior Court also found that petitioner had not demonstrated that several of the alleged lies by Lederman in her bankruptcy petition were false.  The Superior Court addressed petitioner's claim that Lederman lied about the $75,000 residential exemption:

> Petitioner claims that Kathleen L. claimed an exemption of $75,000 for her residence pursuant to Code Civ. Proc. § 704.730(a)(2).  Petitioner claims this was false, because on December 28, 1999, when Kathleen L. filed the bankruptcy petition, there was no other family member who owned no interest in the homestead or had only a community property interest, who resided in the home

with the debtor, because Kathleen L.'s daughter had gone to college and only Kathleen L.'s boyfriend Robert Neuman remained residing in the home with her. In support, petitioner points to Kathleen L.'s testimony in the Liashenko trial, in September 1999, that Kathleen L. had gone through her daughter's clothing "just a couple weeks ago before she left," when Kathleen L. helped her "pack up to leave for college" (RT-218–RT-219 of Liashenko trial testimony of Kathleen L.). The testimony is no more specific than that, and does not indicate that Kathleen L.'s daughter did not come back home during the Christmas holidays, during which time Kathleen L. actually filed the petition, or that the daughter did not consider Kathleen L.'s home to be her residence even though she was temporarily staying at a college.  Nor does petitioner properly quote the exact language of Code Civ. Proc. § 704.730(a)(2), which provides: "(2) Seventy-five thousand dollars ($75,000) if the judgment debtor or spouse of the judgment debtor who resides in the homestead is at the time of the attempted sale of the homestead a member of a family unit, and there is at least one member of the family unit who owns no interest in the homestead or whose only interest in the homestead is a community property interest with the judgment debtor."  The statute requires only that there be one member of the family unit who owns no interest, not that the member of the family unit reside in the home; the statute technically requires only that the judgment debtor reside in the home.  Indeed, "family unit" is defined in Code Civ. Proc. § 704.710(b)(2) as: "The judgment debtor and at least one of the following persons who the judgment debtor cares for or maintains in the homestead: (A) The minor child of the judgment debtor...(D) An unmarried relative described in this paragraph who has attained the age of majority and is unable to take care of or support himself or herself."  That Kathleen L.'s daughter, who Kathleen L. listed as age 18 on her bankruptcy petition, had just started college and may have been living on campus did not necessarily mean that she did not depend on Kathleen L. for support.  There is no reason to believe that Kathleen L.'s daughter, therefore, was not a member of the family unit who owned no interest in the homestead; again, it is not required by the statute that the daughter actually "reside" in the home, whatever meaning that word has in the bankruptcy context, but just that she is one member of the family unit who owns no interest in the homestead.  Indeed, even the judgment debtor need not reside at all times in the home for the exception to apply: "Although the Legislature, in setting forth the amount of the monetary exemption, makes references to the debtor 'who resides in the homestead' (see [Code Civ. Proc.] § 703.730, subd. (a)), we do not read this language to mandate actual or continuous residence" (Webb v. Trippet (1991) 235 Cal.App.3d 647, 651).  Claiming this exemption, therefore, is not shown by petitioner to be a falsity.  Nor does petitioner show that the bankruptcy court ever rejected Kathleen L.'s claim of exemption under Code Civ. Proc. § 704.730(a).

Answer, Exhibit D, pp. 4-5.

The Superior Court rejected the claim that Lederman made a false claim of an auto lien held by her boyfriend:

Petitioner claims that Kathleen L. Falsely claimed on Schedule D that the boyfriend Robert Neuman had a $7000 lien secured by Kathleen L.'s vehicle, a 1990 351 BMW, that was incurred in November 1999.  Petitioner claims this

shows a fraudulent transaction between Kathleen L. and Robert Neuman, to insulate the car from creditors, because the lien was created one month before Kathleen L. filed for bankruptcy, and in October 1999, one month before the lien was created, DMV records show that the First Interstate Bank was the actual lien holder and legal owner as of October 1999.  Petitioner, however, does not supply any documentation of the latter claim regarding DMV records.  Petitioner claims that it makes no sense that Kathleen L. had the note paid off and then re-encumbered the car to Robert Neuman.  Petitioner also refers to a separate bankruptcy document signed on December 23, 1999, that petitioner does not attach to this petition.

Petitioner also refers to Schedule J of the bankruptcy filing that is attached to the petition, showing that she is making no installment payments for an automobile.  Petitioner claims this showed a phantom transaction between Kathleen L. and Neuman, to protect her vehicle from creditors and that she did not intend to pay on it as an actual encumbrance.  Petitioner, however, does not attach any further documentation from the bankruptcy proceeding to show that it was in fact later found to be a fraudulent transaction that was voided by the bankruptcy court.  Without that, petitioner is engaging in pure speculation.

*****

(3) As for Kathleen L.'s bankruptcy proceeding, that Kathleen L. claimed on her Schedule D that her boyfriend Robert Neuman had a $7000 lien secured by Kathleen L.'s vehicle, that was incurred in November 1999, could have served as impeachment evidence to show that Kathleen L. had intended to defraud the creditors by insulating the car from them in this manner.  However, this is speculation on petitioner's part as to why Kathleen L. had had a lien secured on the car by her boyfriend.  Kathleen L. might had had some explanation for doing this, one month before she decided to file for bankruptcy; it could be that at that time she had not intended to file for bankruptcy, and needed some cash, which her boyfriend lent her in exchange for securing the lien in that amount, then thereafter when she found she could not pay it back she filed for bankruptcy.  Admitting this at trial might have caused litigation over this collateral issue, which might well have subjected it to exclusion under Evid. Code § 352.  As for Kathleen L.'s failure to list the Neuman auto lien on the Statement of Financial Affairs, this could well have been a mistake on her attorney's part, in omitting this in preparing the documents for Kathleen L. to sign, and is not particularly probative on whether Kathleen L. is dishonest.

Id., pp. 5-4, 10.

The Superior Court made the following findings regarding Lederman's failure to disclose Liashenko's rent as part of her income:

Petitioner claims that on the Statement of Financial Affiairs, Kathleen L. failed to report her income from the rent that Liashenko was paying to her, even though paragraph two of the statement requires a listing of the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement

of the case.  Petitioner has filed an affidavit from Liashenko, stating that Liashenko paid $200 per month rent to Kathleen L. from August 1997 through February 1999, at which time he moved out.  Petitioner also attaches a copy of the transcript of Kathleen L.'s testimony at Liashenko's trial, in which she testified that Liashenko at some point began paying her rent but she could not remember when (RT-34, RT-167 of transcript from Liashenko trial).  Thus, at the time that Kathleen L. filed her bankruptcy petition, although Liashenko had long since ceased living in her home and paying her rent, according to Liashenko he nevertheless had paid rent for part of the two-year period that preceded that December 28, 1999 filing of the bankruptcy petition.

\*\*\*\*\*

...[T]his might have been impeachment evidence.  However, Liashenko had been accused by Kathleen L. of having molested her daughter, thus could be shown to have bias against her, casting doubt on his credibility.  His statement in the affidavit is the only proof petitioner has that he paid Kathleen L. rent during the time period in question.  Kathleen L. stated elsewhere that he did pay her rent "eventually" but that she did not know when that was.  It could be that she didn't remember him paying her rent in the two years before filing the bankruptcy petition; his claim was that he had stopped paying her rent 10 months before she filed the petition, and it is possible that she had no recollection of his paying rent during the prior year.  If she had no recollection, it would not have been an intentional lie on her part, to not list the rent as part of her income.  Thus, this also could have been subject to Evid. Code §352 exclusion, as it would have involved a mini-trial on what Kathleen L. remembered or should have remembered with regard to the rent issue.

Id., pp. 6, 10-11.

With respect to Lederman's alleged undervaluation of her home, the Superior Court stated that while petitioner claimed that the assessed value of her property was $197,155 rather than the $170,000 she claimed, he failed to attach any evidence to show that at the time of the filing of the bankruptcy petitioner her property was worth $197,155.  Id., 4.  The court found that this claim was based on mere speculation.  Id.

The Superior Court also noted that petitioner submitted no documentation demonstrating that Lederman's lawsuit against Thrifty/Rite Aid ended with a settlement of $16,000, in support of his claim that Lederman lied about this amount in her bankruptcy petition.  Id., p. 2.

As indicated above, the Superior Court found that even if petitioner had been permitted to impeach Lederman with the evidence discussed above, the outcome of the trial

16

1   would not have been different:

> The above-quoted conversation quite simply sealed petitioner's fate in this trial. In his own words, he admitted he was unprofessional and adopted admissions that he had, in fact, committed the acts. Even if the impeachment evidence described above had been introduced at trial, the outcome of the trial would not have been different. The matters were fairly trivial, and in comparison to petitioner's admissions and adoptive admissions from his own mouth, in the telephone call, would not have affected the jury's conclusion that petitioner had in fact committed the acts. There being no prejudice from any failure on defense counsel's part in presenting the impeaching evidence, the claims against petitioner are denied. (<u>Strickland v. Washington</u> (1984) 466 U.S. 668.)

8   <u>Id.</u>, pp. 13-14.

9           It is true, as petitioner contends, that the Superior Court engaged in a blending of

10  accepting petitioner's allegations, but also finding some allegations insufficiently proven.

11  Generally, it is the allegations that give rise to the need for an evidentiary hearing in state court; a

12  petitioner does not have to prove his case ahead of that hearing except insofar as the specific

13  allegations must establish prejudice. If respondent does not dispute the asserted facts, the court

14  may assume the truth of the facts. <u>See</u> <u>In re Fields</u>, 51 Cal. 3d 1063, 1070 (n.2), 275 Cal. Rptr.

15  384, 388 (1990). As far as gauging the need for a federal evidentiary hearing, the court is not

16  bound by the state habeas procedural rulings of the sufficiency of the facts alleged in state court;

17  rather, this court reviews such pronouncements on the question of petitioner's diligence in

18  seeking to present the facts at evidentiary hearing at the earliest opportunity.

19          Insofar as the Superior Court found that some of petitioner's allegations were

20  insufficiently proved, the undersigned finds the Superior Court's ruling as too harsh in

21  connection with the federal evidentiary hearing diligence inquiry, except as specifically found

22  below. The allegations were specific, and although it behooves petitioner to attach as much

23  evidence as he can as early as he can, if the Superior Court had any questions about the

24  allegations, or believed that the allegations required further development, the Superior Court had

25  the opportunity to order an evidentiary hearing. Therefore, with respect to the proffered

26  impeachment of the victim evidence, and for purposes of assessing the need for a federal

1   evidentiary hearing, the undersigned will not find that petitioner has insufficiently alleged

2   specific facts.  For the purposes of these Findings and Recommendations, the undersigned will

3   assume those as true, and move to the prejudice inquiry.

4         However, where the Superior Court found that petitioner's impeachment evidence

5   would probably not have been admitted, a quasi-prejudice finding, the undersigned does not

6   dispute such findings pursuant to state evidence law.  With the exception of the victim collusion

7   allegations, which the undersigned will discuss below, petitioner fails to recognize that allowing

8   impeachment on a collateral matter is highly discretionary with the court.  And misrepresenting

9   facts in a bankruptcy petition, or not being completely truthful in a deposition on an unrelated

10  civil matter are collateral matters.  "Although a criminal defendant is constitutionally entitled to

11  present all relevant evidence of significant probative value in his favor, this does not mean the

12  court must allow an unlimited inquiry into collateral matters; the proffered evidence must have

13  more than slight relevancy."  People v. Marshall ,13 Cal. 4th 799, 836, 55 Cal. Rptr. 2d 347

14  (1996).  Presentation of impeachment evidence by the defense is subject to restriction under Cal.

15  Evid. Code § 352 if it is cumulative or if it constitutes impeachment on collateral issues.  People

16  v. Mincey , 2 Cal. 4th 408, 439-440, 6 Cal. Rptr. 2d 822 (1992); People v. Morse , 2 Cal. App.

17  4th 620, 641-642, 3 Cal. Rptr. 2d 620 (1992).  And, the trial court has wide discretion in

18  determining the admission of such impeachment evidence "to prevent criminal trials from

19  degenerating into nitpicking wars of attrition over collateral credibility issues."  People v.

20  Wheeler , 4 Cal. 4th 284, 296, 14 Cal. Rptr. 2d 418 (1992).  It is nearly impossible for a federal

21  habeas petitioner to successfully present a federal issue involving state courts' interpretation and

22  application of their law.  See Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).

23        Assuming for the moment, however, that the state trial court would have abused

24  its discretion in a federal Confrontation Clause sense, or "right to present a defense" sense, in not

25  permitting impeachment on the collateral matters highlighted in these habeas corpus proceedings,

26  if such matters had been presented to it for admission by defense counsel, and assuming further

that the trial at issue was simply a swearing contest between the victim and the defendant, the court might well find that failure to acquire and present the impeachment evidence undermined confidence in the outcome of the proceedings.  A defendant in a sex offense case is not to be so hamstrung that he not be permitted to present evidence demonstrating the victim's propensity to be untruthful in other matters.  And, it is not dispositive in favor of respondent that the impeachment might have been mitigated when all the facts were learned—that is what an evidentiary hearing may have shown.

But even assuming that the state trial court would have committed constitutional error in not permitting the collateral impeachment, had such been presented to it, petitioner's insurmountable hurdle is the damning tape recorded call, and the other victims' testimony about similar conduct directed at them.  Combined, this evidence makes the impeachment evidence insignificant.  Despite petitioner's protestations, the tape recording has "guilty" written all over it.  The undersigned agrees with the Superior Court that the tape recording "sealed" petitioner's fate.  Petitioner's argument that he was just admitting the hug, and ignoring the real criminal conduct allegations, without ever explaining that he was rejecting the serious allegations, does not work.  Giving a sympathetic hug when the situation calls for it is not being unprofessional.  Commencing activities of a clearly sexual nature is.  That is what petitioner was apologizing for, and admitting to.  Moreover, the prosecution presented the testimony of three women who had experiences with petitioner similar to the complainant in this case.  The outcome of the trial would not have been different had the alleged impeachment evidence been admitted.

Because the court has assumed that petitioner could prove his impeachment if given the opportunity at an evidentiary hearing, but that such hearing could not produce facts sufficient to constitute prejudice in light of the evidence as a whole, petitioner is not entitled to an evidentiary hearing.  The holding of such a hearing would be an idle act.

For the reasons discussed above, this claim should be denied.

/////

1
2

*Failure to Investigate Lederman's Poor Reputation and Character for*
*Untruthfulness*

3    Petitioner argues that his counsel failed to investigate or offer testimony of

4    persons who held adverse opinions of Lederman's reputation and character for truthfulness and

5    veracity.  Petitioner claims that those witnesses would have been her former husbands, Ron

6    Lederman and Greg Cook, as well as Joe Liashenko.  Petitioner concedes that his counsel made

7    efforts to locate Ron Lederman, who refused to get involved.  Based on this admission, the court

8    does not find counsel ineffective for failing to investigate this witness.  Petitioner admits that

9    counsel attempted to find Mr. Liashenko, but abandoned this effort after the trial court ruled that

10   Liashenko would not be permitted to testify as to his sexual relationship with Lederman.

11   Other than his conclusory assertion, petitioner provides nothing suggesting that

12   Cook actually had an opinion regarding the truthfulness of Lederman and would have been

13   willing to testify to this.  For these reasons, the court finds that petitioner has not demonstrated

14   that counsel was unreasonable for failing to investigate Cook nor that he was prejudiced by

15   counsel's failure to call Cook as a witness.

16   As for Liashenko, Lederman had previously accused him of molesting her

17   daughter.  These accusations would have put Liashenko's credibilty regarding Lederman at issue.

18   His opinion regarding Lederman's character would have had little value.  For these reasons, the

19   court finds that petitioner was not prejudiced by counsel's failure to call Liashenko as a witness

20   regarding Lederman's poor reputation and character for untruthfulness.

21   The denial of this claim by the Superior Court was not an unreasonable

22   application of Supreme Court authority.  Accordingly, this claim should be denied.

23   In the traverse, petitioner argues that he is entitled to an evidentiary hearing to

24   prove his claims.  Petitioner is not entitled to an evidentiary hearing as to this claim because his

25   conclusory allegations unsupported by specific allegations.  Williams v. Woodford, 384 F.3d

26   567, 588 (9th Cir. 2004).  Moreover, in any event, the tape recording and unimpeached witnesses

1   testifying to petitioner's misconduct mitigates this impeachment to unimpressive status.

2   *Failure to Investigate Likelihood of Collusion of Complaining Witnesses*

3   Petitioner claims that he informed defense counsel prior to trial that he suspected

4   collusion in the office between Mary Rodriguez, his former employee, and Lederman, in an

5   attempt to attain a financial settlement.  Petitioner observed that Rodriguez quit her job in

6   petitioner's medical office on the same day that Lederman made the pretext telephone call.

7   Petitioner argues that Rodriguez would not have known about the call taking place on this date

8   unless she had a private channel of communication with Lederman.  Petitioner argues that his

9   counsel should have subpoenaed telephone records of Rodriguez and Lederman and investigated

10  their collusion.

11  Other than his conclusory assertions, petitioner has provided nothing to support

12  his claim of collusion.  For this reason, the court finds that petitioner has failed to demonstrate

13  prejudice as a result of counsel's failure to investigate the alleged collusion.  Because the denial

14  of this claim by the Superior Court was not an unreasonable application of clearly established

15  Supreme Court authority, this claim should be denied.

16  In the traverse, petitioner argues that he is entitled to an evidentiary hearing to

17  prove his claims.  Petitioner is not entitled to an evidentiary hearing as to this claim because his

18  conclusory allegations are unsupported by any probative, specific allegations.  <u>Williams v.</u>

19  <u>Woodford</u>, 384 F.3d 567, 588 (9th Cir. 2004).   And again, this impeachment, even if proven,

20  would not outweigh the tape recording and independent witnesses.

21  B.  <u>Improper Admission of Uncharged Conduct</u>

22  The Superior Court was the last court to issue a reasoned opinion as to this claim.

23  Answer, Exhibit B.  Accordingly, the court considers whether the denial of this claim by the

24  Superior Court was an unreasonable application of clearly established Supreme Court authority.

25  <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (citing <u>Ylst v. Nunnemaker</u>,

26  501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991)).

1    The trial court permitted three women to testify regarding petitioner's sexual

2 misconduct toward them.  In particular, Candice Walker testified that she worked as a medical

3 assistant in training in petitioner's office in 1997.  RT at 486-487.  One evening, petitioner asked

4 her to stay late to discuss her future employment.  RT at 488.  As she tried to leave petitioner's

5 office after this conversation, petitioner forcefully kissed her, grabbed and groped her.  RT at

6 489.

7    Shannon Green testified that she was one of petitioner's former patients.  RT at

8 544-545.  She saw him when she was pregnant nine years before the trial.  RT at 544.  He saw

9 her after a surgical procedure to remove staples from an incision.  RT at 549.  After the

10 procedure, he hugged her and she could feel his erection.  RT at 549.  He also moved his face

11 toward her and attempted to kiss her.  RT at 552.

12    Yolanda Villanueva testified that she was one of petitioner's former patients.  RT

13 at 585.  She began seeing petitioner about seven or eight years before the trial, and continued to

14 see him for the next six or seven years.  RT at 585.  One of the last times she saw petitioner, he

15 stood between her legs, grabbed her arm and told her that she dressed sexy.  RT at 586, 587.

16    Cal. Evid. Code § 1101(b) permits admission of evidence that a person committed

17 a crime, civil wrong or other act when relevant to prove some fact (such as motive, opportunity,

18 intent, preparation, plan, knowledge, identity, absence of mistake or accident, etc.) other than his

19 disposition to commit such an act.  In a criminal action in which the defendant is accused of a

20 sexual offense, Cal. Evid. Code § 1108 permits admission of the defendant's commission of

21 another sexual offense to prove his disposition to commit the offense so long as the evidence is

22 not inadmissible pursuant to Cal. Evid. Code § 352.  Section 352 provides: "The court in its

23 discretion may exclude evidence if its probative value is substantially outweighed by the

24 probability that its admission will (a) necessitate undue consumption of time or (b) create

25 substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

26 \\\\\

1          Evidence of other sexual offenses pursuant to § 1108 cannot be used in cases

2    where its probative value is substantially outweighed by the possibility that it will consume an

3    undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or

4    mislead the jury.  People v. Falsetta, 21 Cal. 4th 903, 916-920, 89 Cal. Rptr. 2d 847, 855-858

5    (1999).  In evaluating the admission of such evidence, California courts consider such factors as

6    its nature, relevance and possible remoteness, the degree of certainty of its commission and the

7    likelihood of confusing, misleading or distracting the jurors from their main inquiry, its similarity

8    to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in

9    defending against the uncharged offense, and availability of less prejudicial alternatives to its

10   outright admission, such as admitting some but not all of the defendant's other sex offenses, or

11   excluding irrelevant though inflammatory details surrounding the offense.  Id. at 916-917, 89

12   Cal. Rptr. 2d at 855-856.  The probative value of other crimes offenses is increased by the

13   relative similarity between the charged and uncharged offenses, the close proximity in time of the

14   offenses, and the independent sources of evidence (the victims) in each offense.  Id. at 917, 89

15   Cal. Rptr. 2d at 856.

16          Evidence of the uncharged acts was admitted in petitioner's trial pursuant to §

17   1108 to prove disposition and pursuant to § 1101(b) to prove common scheme or plan.  RT at

18   1405-1406.  The instant claim only challenges admission of this evidence pursuant to § 1108.

19          Petitioner argues that "in the absence of a demonstration of relevance, and given

20   the inherently prejudicial nature of other crimes, Evidence Code section 1108 violates due

21   process." Points and Authorities, p. 32.  To the extent petitioner argues that Evid. Code § 1108 is

22   unconstitutional because it allows admission of evidence of prior sexual crimes solely for the

23   purpose of proving disposition to commit the present offense, the Supreme Court has explicitly

24   left open the question of whether the admission of evidence of other crimes to prove propensity

25   violates due process.  See Estelle v. McGuire, 502 U.S. 62, 75 n. 5, 112 S. Ct. 475 (1991) ("[W]e

26   express no opinion on whether a state law would violate the Due Process Clause if it permitted

23

the use of 'prior crimes' evidence to show propensity to commit a charged crime.").  Because

petitioner cannot identify any holding of the Supreme Court that supports this clam, the court

finds that the Superior Court's decision denying this claim was not contrary to any clearly

established Supreme Court authority.  See also United States v. LeMay, 260 F.3d 1018 (9th Cir.

2001) (permitting propensity evidence in a sex offense case pursuant to federal law).

Petitioner may also be arguing that the uncharged acts evidence was inadmissible

under § 1108.  For a state law violation to rise to a constitutional violation, there must be a

violation of fundamental fairness.  Estelle v. McGuire, 502 U.S. 62, 73, 112 S. Ct. 475, 482

(1991).  No violation of fundamental fairness occurred because the evidence of the uncharged

acts was admissible under state law.  First, admission of uncharged offenses (as opposed to

convictions) is proper under § 1108.  People v. Reliford, 29 Cal. 4th 1007, 1009, 130 Cal. Rptr.

2d 254 (2003).  In addition, the uncharged acts in the instant case were not too remote and were

similar to the present offense.

Petitioner also challenges the jury instruction given in the case, CALJIC No.

2.50.01.  Petitioner argues that this instruction unconstitutionally reduced the prosecution's

burden of proof by allowing the jury to infer from a preponderance of evidence that petitioner's

past offenses disposed him to commit similar offenses and made him likely to commit the

charged crimes.  The jury was instructed in relevant part:

> If you find that the defendant committed a prior sexual offense, you may, but are
> not required to, infer that the defendant had a disposition to commit the same or
> similar type of sexual offenses.
> If you find the defendant had the–this disposition, you may, but are not required
> to, infer that he was likely to commit and did commit the crime for crimes of
> which he is accused.  However, if you find by a preponderance of the evidence
> that the defendant committed prior sexual offenses, that is not sufficient by itself
> to prove beyond a reasonable doubt that he committed the crimes–the charged
> crimes. The weight and significance of the evidence, if any, is for you to decide.

RT at 1406.

The instruction was derived from the 1999 version of CALJIC 2.50.01 and 2.50.2.

The improvement in the 1999 instruction added: "However, if you find by a preponderance of the

1  evidence that the defendant committed [a prior crime or crimes involving domestic violence],

2  that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged

3  crimes." See Gibson v. Ortiz, 387 F.3d 812, 919 (9th Cir. 2004); See generally People v.

4  Reliford, 29 Cal. 4th 1007, 130 Cal. Rptr. 2d 254 (2003); People v. Falsetta, 21 Cal. 4th 903, 89

5  Cal. Rptr. 2d 847 (1999).

6          Gibson v. Ortiz, supra, found a due process "lessening of the burden of proof"

7  problem with the combination of CALJIC 2.50.01 and 2.50.1, both of which are contained in the

8  quoted language above.[4]  As Gibson found, relating to the jury that they could infer that plaintiff

9  committed the crime by proof of prior offenses, and immediately relating to the jury that the

10 requisite proof could be established by only a preponderance, instructed the jury that proof of the

11 charged offense could be found by a preponderance. Id. 387 F.3d at 822.   The critically

12 distinguishing feature, however, is the fact that the Gibson instruction did not contain the

13 "improved" language of the 1999 CALJIC, i.e., the added proviso that finding propensity by a

14 preponderance was insufficient in and of itself  to satisfy the beyond a reasonable doubt standard.

15 Gibson, 387 F.3d at 819.  The clear implication from Gibson is that this change made all the

16 difference in the world.  And, it does make quite a difference because it solves for the most part

17 the pre-1999 CALJIC problem.  The critical point is that the jury was instructed post-1999 that it

18 had to find the charged offenses beyond a reasonable doubt.  Moreover, the California courts

19 have blessed the 1999 improvement from a constitutional perspective, and petitioner must show

20 that such blessing *still* unreasonably applies Supreme Court precedent—a not so easy task.

21         Gibson v. Ortiz, supra, decided October 4, 2004, i.e. shortly after petitioner filed

22 his traverse, forecloses petitioner's challenge to the jury instruction discussed above.

23

24         [4]  Gibson itself was an AEDPA  habeas case and found that clearly established Supreme
   Court law concerning lessening the burden of proof permitted it to grant the petition in its
25 CALJIC 2.50.01 context.  The undersigned is bound by that interpretation of the status of the
   law, and thus, does not discuss it at length.  That is, if the prosecution burden of proof was
26 lessened in Gibson, and we were dealing with the instruction at issue in Gibson, the undersigned
   could not find on his own that the Ninth Circuit wrongly interpreted Supreme Court precedent.

1    For the reasons discussed above, the court finds that the Superior Court's denial

2  of petitioner's claims challenging the constitutionality of § 1108, the admission of evidence

3  under this section and the related jury instruction, was not an unreasonable application of clearly

4  established Supreme Court authority.  Accordingly, these claims should be denied.

5    Accordingly, IT IS HEREBY RECOMMENDED that:

6    1.  Respondent's April 28, 2004, motion to dismiss be denied;

7    2.  Petitioner's application for a writ of habeas corpus be denied.

8    These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: 5/17/05

17

18    /s/ Gregory G. Hollows

19    GREGORY G. HOLLOWS
    UNITED STATES MAGISTRATE JUDGE

20  ggh:kj
    hild607.157

21

22

23

24

25

26